**FILED**

SEP - 4 2007

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DANIEL G. PINEGAR )
1600 S. Joyce Street, Apt. 1604 )
Arlington, Virginia  22202 )
Tel:  703-920-7666 )
 )
VS. )   Civil Action No. _____
 )   **JURY TRIAL DEMANDED**
FEDERAL ELECTION COMMISSION, )
   an independent regulatory agency, and )
Robert D. Lenhard, Chairman )   Case: 1:07-cv-01560
999 E  Street, N.W. )   Assigned To : Kennedy, Henry H.
Washington, D.C.  20463 )   Assign. Date : 9/4/2007
 )   Description: Employ. Discrim.
_____ )

**COMPLAINT**

1.     PLAINTIFF, appearing *pro se*, hereby files this Complaint against Defendant, the

FEDERAL ELECTION COMMISSION (hereinafter "FEC") and its current Chairman, Robert

D. Lenhard, and in support thereof states, as follows:

**Preliminary Statement**

2.     This action seeks declaratory, injunctive and equitable relief, compensatory and

pecuniary damages, and reasonable attorney's fees and costs of this action to date, for:

(a) retaliation for Plaintiff engaging in protected activities, including exercising his rights under a

Labor Management Agreement by filing grievances and complaints, and making suggestions to

improve the efficiency of the service; (b) retaliation for Plaintiff's responsible actions to safe-

guard statutorily confidential and sensitive materials protected from disclosure; (c)

discrimination based on actual and/or perceived disability of the Plaintiff, wherein Defendant

failed to provide Plaintiff with reasonable accommodations; (d) discrimination based on

disparate treatment toward Plaintiff based on his gender; (e) retaliation for Plaintiff's engaging in

Equal Employment Opportunity activities; (f) discrimination on the basis of Plaintiff's conduct that did not adversely affect the efficiency of the service; (g) breach of Plaintiff's employment contract;  (h) defamation of Plaintiff's character; (i) violation of Plaintiff's right to privacy; (j) violation of Plaintiff's rights under the Family & Medical Leave Act; and (k) violation of Plaintiff's right to procedural and substantive due process.

### Parties

3.      Plaintiff Daniel Pinegar is a male citizen of the United States and former employee of the FEC where he served as a career civil servant Attorney in the Enforcement Division within the Office of General Counsel from December 2001 to July 2005.  Plaintiff was employed by the Defendant in Washington, D.C.

4.      Defendant is the Federal Election Commission, an independent regulatory agency of the United States Government located at 999 E Street, N.W., Washington, D.C. 20463. Defendant is Plaintiff's former employer.

### Jurisdiction and Venue

5.      Plaintiff was employed by the FEC in Washington, D.C.

6.      This Court has jurisdiction over this Complaint based upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.; the Civil Rights Act of 1991 and Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. 791 et seq.; the Civil Service Reform Act of 1978, 5 U.S.C. 2302 et seq.; 28 U.S.C. 2201 and 2202; and because other questions of federal law are presented, pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1361; all acts complained of took place within the District of Columbia during the course of Plaintiff's employment.  This Court has supplemental jurisdiction of any pendant state law or common law claims pursuant to 28 U.S.C. 1367.

7.      Venue in this Court is proper as the cause of action arose in the District of Columbia, pursuant to 28 U.S.C. 1391(e). Defendant is located in the District of Columbia and operates at a single headquarters and office in the District of Columbia.

## **Exhaustion of Administrative Remedies**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

8.      Plaintiff has exhausted his administrative remedies. Plaintiff, by and through his union representative of the National Treasury Employees Union, Chapter 204 ("NTEU"), timely filed multiple grievances under the Labor Management Agreement against the FEC on the matters herein. Plaintiff was removed from his position, and Plaintiff, by and through the NTEU, who appointed a non-legal representative, invoked the right to arbitrate the FEC's Final Decision. A hearing was held and on July 26, 2006 an Arbitrator issued a Decision denying the grievance and upholding the removal action.

9.      Plaintiff then timely filed a Petition for Review with the Merit System Protection Board ("MSPB") on a mixed-case appeal from the Arbitrator. The MSPB accepted the appeal and issued its Final Decision on the merits on May 30, 2007. This decision was mailed by certified mail and was received by the Plaintiff on June 12, 2007.

10.     Plaintiff then timely filed a mixed-case appeal with the Equal Employment Opportunity Commission ("EEOC"). The EEOC accepted the appeal and issued its Final Decision on the merits and all issues on July 31, 2007. This decision was mailed by First Class mail and was received by the Plaintiff on August 4, 2007. Plaintiff timely files this Complaint on September 4, 2007 within 30 days of receipt of the Final Decision of the EEOC.

## Facts

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

### Allegations Common to All Counts

### *Plaintiff's Performance History*

11.    Plaintiff began employment with the FEC on December 3, 2001. After Plaintiff successfully completed the first-year "probationary period" at the FEC he was promoted to a permanent position as a GS-12.

12.    Plaintiff was a member of the bargaining unit and a dues paying member of the local chapter of the NTEU. Plaintiff's employment relationship with the Defendant was then governed by the rights and duties found in the Labor Management Agreement ("LMA") between the FEC and the NTEU.

13.    By Plaintiff's second year with the Defendant, he was extremely successful and productive in completing his primary job functions towards the missions of the FEC. As part of his job he fully designed and strategically executed complex legal investigations and discovery, and worked to negotiate dozens of conciliation agreements and settlements with respondents. Plaintiff also worked on and negotiated settlements in two of the largest civil penalty cases in the history of the FEC.

14.    In addition to Plaintiff's other job responsibilities, Plaintiff was encouraged by many people at the FEC to be an agent for reform from the inside at a time when the Defendant was often criticized by Members of Congress and the media as a toothless tiger, too slow to respond to the influx of the many campaign finance challenges. This included Plaintiff's first supervisor who encouraged him to be a change-agent, to ask questions, and to make or

4

recommend improvements from the way things had "always been done" as a matter of course. Plaintiff and his first supervisor understood that just because the FEC had always done things a certain way, that did not mean that they were *de facto* the best or only way to successfully get the job done. As a result, Plaintiff's supervisor personally selected him to review and work to improve entire "work processes."

15.    In December 2003, the Defendant reorganized the Office of the General Counsel and shifted many employees, including Plaintiff, to new supervisors. At the same time, Plaintiff received a performance award and the Chair of the Commission recognized Plaintiff with an Award for Teamwork for his work in a case that settled with a record-breaking civil penalty.

### Plaintiff was wrongfully denied a promotion

16.    Plaintiff's performance appraisal for 2003 was delayed by the Defendant; despite the previous year's outstanding successes and productivity, at the end this period Plaintiff's new supervisor wrongfully denied Plaintiff his earned promotion.

17.    Plaintiff initiated a formal grievance under the LMA protesting Defendant's wrongful denial of his promotion. Among the violations of the LMA which were grieved, Defendant failed to provide the Plaintiff with the required 90-day notice that his performance was not considered sufficient to justify a career-ladder promotion; and failed to prepare Plaintiff's performance appraisal in a reasonable, fair and objective manner, and in fact used disparate standards. From this point forward several of Defendant's managers grew tired of Plaintiff exercising his legal rights, and for the next five months retaliated against Plaintiff for his grievances and other protected activities, ultimately removing him from his position for exercising his rights.

## *Cancer, Disabilities and Requested Accommodations*

18.    Simultaneous to the disputed performance review period, Plaintiff learned in January 2004 that his mother had developed cancer. Plaintiff informed both of his supervisors of this fact in January 2004 and again in May 2004 when his performance was eventually evaluated. As a result of this devastating news, and the simultaneous end to a long-term personal relationship, Plaintiff experienced depression for which he responsibly sought treatment. This treatment included both therapy and taking medications.

19.    Plaintiff also experienced increased generalized anxiety and stress which was exacerbated with both a new supervisor and pile-driving at a construction site adjacent to the FEC's offices.

20.    Plaintiff informed the Defendant that he was suffering from these disabilities and made specific requests for accommodations during this difficult period of adjustment. Defendant encouraged Plaintiff to visit a counselor in the Employment Assistance Program ("EAP"), but offered no other accommodations. Plaintiff briefly used the EAP but reported back to the Defendant, however, that the EAP was not helpful, and indeed told him to "just deal with it."

21.    In July 2004, Plaintiff met with the Associate General Counsel where he informed her too that he had a permanent disability and certain impairments. Plaintiff requested reasonable accommodations, including reassignment or transfer to a vacant position for which he qualified. Plaintiff applied for one position and was never granted an interview. Plaintiff also provided the FEC with a report from a medical expert who took a complete history and objectively evaluated him. This report indicated that Plaintiff suffers from these permanent impairments and said impairments causes him to be substantially limited in the major life activity of sleeping, working, thinking, and concentrating.

22.    Despite Plaintiff's requests, Defendant ignored the overwhelming medical evidence and denied his requests for accommodations in violation of his rights under the Rehabilitation Act.

### The Assault on the Plaintiff

23.    On June 30, 2004, Plaintiff was assaulted after duty hours by a homeless man on the street outside of the Defendant's office building.  A nearby bouncer witnessed the assault and pulled the attacker off of the Plaintiff's back.  After Plaintiff walked briskly back to Defendant's office, the bouncer released the man and he sprinted back towards the Plaintiff.  The man threatened Plaintiff with bodily harm and violence, pushed him, and said he was going to "knock off" Plaintiff's glasses.  Plaintiff ran to the lobby of Defendant's office building.

24.    Plaintiff immediately shouted to the two security guards contracted by Defendant who were sitting at a security desk in the lobby for help outside.  Plaintiff feared that his attacker might follow him into the Defendant's lobby.  The Defendant's security guards showed no interest whatsoever in the happenings outside and utterly failed to assist Plaintiff in any way.  At that point one guard said in response to Plaintiff's pleas, "That's not my job."

25.    Plaintiff then approached the security desk and asked them to call the D.C. Metropolitan Police Department.  Again, the guards refused to act and insisted that if Plaintiff wanted to call the police then he had to do it himself.  One guard then shoved the telephone across the desk for Plaintiff to call the police.  It took the Plaintiff three attempts to first get an outside line and then correctly dial 9-1-1 because he was in shock and looking out the lobby doors.  While the 9-1-1 operator was talking with dispatch the Plaintiff asked the guard for her name and to see her identification.  The guard refused, covering up her name badge and scooted the chair in which she was sitting back away from the Plaintiff.  After the call ended, Plaintiff

told the security guards to take a report on the incident and went to his office. The security guard then responded, "Whatever!"

26.     Plaintiff returned to his office  and emailed his supervisor about the assault. A few moments later Plaintiff's supervisor and two persons from Defendant's personnel office went with Plaintiff to the lobby to speak with the arriving police officers. Plaintiff recounted the attack and gave the officers his information; Plaintiff said that he was feeling anxious and having a panic attack and took leave to a nearby restroom. Plaintiff's supervisor saw that there were marks on Plaintiff's hand and asked if he wanted an ambulance called, which Plaintiff declined before going home. Plaintiff then took two days off of work and returned the following Monday. On that day he emailed his supervisor and asked that the video surveillance tapes from the lobby be saved. Plaintiff subsequently filed complaints with the Defendant and the Federal Protective Services about the behavior of the security guards that day.

27.     Instead of using the incident as a call to improve contracted security services, Defendant would later use Plaintiff's alleged behavior in the lobby as a primary reason to justify his removal. Said reason was a pretext to its actual discriminatory and retaliatory intent.

### *The Health Unit*

28.     Plaintiff went to the Defendant's Health Unit on September 7, 2004 to receive a routine allergy shot as he had done on a monthly basis since February, 2004.

29.     When the nurse retrieved his file she could not discern what dosage should be given or read the physician's writing. When she asked the Plaintiff who his allergist was and what his phone number so she could call him Plaintiff indicated that he recently changed health providers and did not know the name or phone number for the new physician. The nurse became upset and agitated that Plaintiff did not know who his Doctor was. Plaintiff spoke with a Doctor

in the neighboring examination room to request that he administer the allergy shot. After the Doctor told Plaintiff that he would defer to the nurse and that Plaintiff could not receive his shot, Plaintiff stated that he would just come back next week when the other nurse was on duty and left the health unit.

30.    Later that morning the nurse called Plaintiff twice to see if he had his Doctor's information yet so that she could still administer the shot to him that morning, which he did not. The nurse finished her normal workday and made no report of anything out of the ordinary with the Plaintiff to the FEC.

31.    The following week Plaintiff went to Defendant's Health Unit to receive the allergy shot he had been refused the week before. A second nurse who normally administered Plaintiff's allergy shots was on duty and told the Plaintiff all of his paperwork was in order, that the dosage and doctor were clear, and that she did not know why the other nurse did not or could not administer the allergy shot. This nurse told the Plaintiff that there must have just been a simple misunderstanding and administered the shot.

32.    Plaintiff is informed that the following day, the first nurse allegedly complained about the Plaintiff in the Health Unit and was requested to provide a written statement to back up her allegations. However, the nurse's initial written statement to the Staff Director was evaluated and because the Staff Director wanted the Plaintiff's employment terminated, the statement was rejected. Defendant later concocted a story alleging that Plaintiff's behavior during his health unit with the nurse somehow justified removal. This incident was also used as a pretext to its actual discriminatory and retaliatory intent.

### *Administrative Leave & Removal*

33.    Plaintiff continued to work in an on-duty status for the Defendant until September 16, 2004. On that date he was notified by the Deputy General Counsel that effective immediately Defendant's former Staff Director James Pehrkon was placing him on administrative leave in a non-duty status. Prior to this action Defendant had never given the Plaintiff any formal warnings, discipline, or adverse action while he was employed at the FEC for any performance or conduct deficiencies. Nor did he have any notice whatsoever that his behavior in the lobby following the assault or in the health unit were in any way an issue. Mr. Pehrkon indicated that some unnamed employees had expressed concern about Plaintiff's behavior in the lobby with the security guards months earlier, apparently not knowing about the assault and battery. Mr. Pehrkon also stated that Plaintiff was disruptive and inappropriate in the Health Unit the previous week by demanding his allergy shot. Defendant stated that the administrative leave was a temporary measure "out of concern for the safety and well-being of other employees while Management investigates the incident." Defendant stated that the administrative leave was not disciplinary and would not be made a part of any personnel file. Defendant then had the Plaintiff escorted out of the office.

34.    During this administrative leave the Defendant required that the Plaintiff call his supervisor every Monday until further notice and to be available to return to duty status within 24 hours of telephone notification. For the next ten months, the Plaintiff obeyed this directive and contacted his supervisor weekly, and was ready, willing and able to return to work within 24 hours. One week after being placed on leave Plaintiff notified the staff director that he was willing to do what it takes to return as soon as possible and offered to undergo a fitness for duty evaluation to facilitate it. Defendant was never responded to Plaintiff's offer.

35.    The NTEU made several document and information requests of the FEC's justification for its placement of the Plaintiff on indefinite administrative leave. For several months Defendant neither provided Plaintiff nor the NTEU with any supporting evidence.

36.    After Defendant's Staff Director insisted that the Plaintiff be placed on administrative leave, the matter was referred to the servicing personnel office for evaluation. Defendant's Director of the Office of Human Resources reviewed the facts and determined that Plaintiff was never a safety concern or threat, and recommended that if Defendant wanted to discipline the Plaintiff for any alleged conduct, that Defendant should follow the principle of progressive discipline as outlined in the LMA. Likewise, a senior labor relations specialist for the Defendant in the same servicing personnel office made his own independent analysis of the allegations. Both of Defendant's own most experienced persons concluded that the Plaintiff could not justly be removed from his position on the facts.

37.    Defendant, through the Deputy Associate General Counsel, Mr. Calvert, issued Plaintiff on November 3, 2004 a Notice of Proposal to Remove alleging two charges: (1) Disruptive Behavior (with 2 separate specifications); and (2) Inappropriate Remarks (with 7 separate specifications). Plaintiff, through local NTEU representation, immediately made several document and information requests, including requesting all materials relied upon in coming to its recommendation, all exculpatory evidence, and the names of his accusers, which the FEC denied or refused to provide. Plaintiff and his NTEU representative then filed a written response that refuted the charges contained in the notice on January 26, 2005, simultaneously making a joint oral presentation to the Defendant's Deciding Official, the Deputy General Counsel, Mr. Kahl.

38.     Defendant kept Plaintiff in this indefinite administrative leave of absence status until he received a letter, dated July 15, 2005, indicating that effective July 23, 2005 Plaintiff was removed from his position and Federal Service based on the events with the security guards, the nurse, and seven unrelated remarks over the course of several months that were allegedly inappropriate.  During this enforced administrative leave status Plaintiff was unable to continue or further his career, receive training, receive performance appraisals, travel, and suffered severe emotional distress.  Plaintiff was also substantially cut off from all friends and colleagues who wanted to help Plaintiff because they feared that the mere association with the Plaintiff might lead to their own retaliatory administrative leave and discipline.

39.     On Plaintiff's opinion and belief, Mr. Pehrkon abused his authority and position within the FEC by engaging in prohibited personnel activities, wrongly encouraging the false allegations against Plaintiff in retaliation for his pending protected activities, grievances and complaints.

40.     Defendant then arbitrarily and capriciously ignored the evidence against removal, including mitigating circumstances, and removed the Plaintiff from his position.  This action was contrary to the efficiency of the service, retaliatory and discriminatory.  Defendant's response was harshly disproportionate to the alleged offenses and resulted in disparate treatment.

41.     Plaintiff has suffered severe emotional distress as a result of Defendant's unlawful actions.  Plaintiff has also suffered in his career advancement, job placement, and financially.

## COUNT I
**(Retaliation for Protected Activities, Filing a Grievance, pursuant to 5 U.S.C. § 2302(b)(9))**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

42.     Plaintiff was entitled to file grievances under the LMA. Such activity is considered a protected activity. After Defendant failed to return Plaintiff's 2003 performance appraisal in a timely manner he complained to his supervisor that it was a breach of the LMA. Subsequently he was denied a promotion in part because of his complaint. Plaintiff then filed a grievance to the denial of his promotion. The Plaintiff's grievance alleged, among other issues, that his 2003 performance appraisal prepared by his supervisor and the Deputy Associate General Counsel was arbitrary and capricious, and that his delayed and denied promotion was improper.

43.     All of the Defendant actors in Plaintiff's removal had actual knowledge of the grievance and were directly involved in the grievance process and became targets in the grievance process. The parity between the FEC's actions against the Plaintiff bear direct and immediate similarity to the Plaintiff's escalation of his grievance. In fact, just after he escalated the grievance to the Step II stage, Defendant gave him a warning for other alleged misconduct. When Plaintiff escalated the grievance to the Step III stage, before Staff Director James Pehrkon, just one week later he wrongly placed the Plaintiff on non-duty administrative leave after issuing an embellished justification memo.

44.     Defendant would not have removed the Plaintiff absent the protected activity. The sequence of events makes manifest the FEC's retaliation against the Plaintiff, seeking to punish him for aggressively pursuing his contractual labor rights. Indeed, Defendant admitted that the grievance was weighing on the FEC and part of a "docket" of protected activities that was simply taking up too much of its time and that this docket was one reason it recommended and upheld removal.

45.    Retaliation was the motive for the removal action in violation of 5 U.S.C. 2302(b)(9).

WHEREFORE, Plaintiff respectfully requests the following relief:

a)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment and engaged in prohibited personnel practices in violation of 5 U.S.C. 2302(b);

b)    Award compensatory and pecuniary damages in an amount to be determined by the jury;

c)    Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

d)    Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP matching, health insurance and all other benefits, and back and front pay with interest to be determined by the Court and/or jury;

e)    Order the Federal Election Commission to issue retroactive "Outstanding" Performance Appraisals, annually, for 2003 to present; and

f)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT II
**(Retaliation for whistleblowing violations of law, gross waste and inefficiency, pursuant to 5 U.S.C. § 2302(b)(8) and (9))**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

46.     Plaintiff reported no less than three times that he observed violations of law, gross waste, inefficiency, and gross mismanagement at the FEC.

47.     Plaintiff stated during a meeting with both his supervisor and an investigator for the FEC that he felt a particular case was being grossly mismanaged after hundreds of hours were spent on it, reports sat around for months, and then the direction was completely changed resulting in work beginning at square one again. This resulted in a gross waste of taxpayer dollars. Plaintiff's supervisor responded by denying Plaintiff a promotion on the very ground that she felt accused of "waste and poor management" in the case because it was "in front of a Commission investigator." Defendant later used the supervisor's comment as justification during his removal in violation of 5 U.S.C. 2302(b)(8)-(9).

48.     Plaintiff also observed, on May 5, 2004, that several boxes of materials from enforcement investigations were recklessly placed beside several garbage cans in a hallway with the word "basura" or "trash" written on the boxes. Such information is protected from general public disclosure pursuant to 2 U.S.C. § 437g(a)(12) and 11 C.F.R. 111.21, and Plaintiff appropriately sought to safeguard it from the reckless release into the public garbage. Plaintiff secured the materials and notified his supervisor about this obvious violation before speaking another management official about it. The culpable party entered the conversation and stated she planned to retrieve the boxes and throw them in the dumpster. Plaintiff informed his supervisor

that he would be notifying the Office of the Inspector General about the matter, which he did by email.

49.    On May 14, 2004, the very day that Plaintiff filed a grievance contesting his performance appraisal and denied promotion, Plaintiff's supervisor and an employee relations specialist discussed the May 5th encounter regarding the confidential materials with the Plaintiff. Plaintiff's supervisor, a management official with Defendant, prepared a memorandum, dated June 30, 2004, in which Plaintiff's behavior in reporting the near violation of law was deemed "inappropriate." This memorandum also stated though that no further action was indicated or warranted as a result of this purported inappropriate behavior, and that the notice was neither disciplinary action nor made a part of a permanent personnel file. Nevertheless, Defendant later used this document as a key reason to justify Plaintiff's removal, completely overlooking the fundamental correctness of his concerns and in violation of 5 U.S.C. 2302(b)(8)-(9).

50.    After Plaintiff received this memorandum, he wrote an email to his supervisor in which he stated that he felt it was retaliation against him for escalating his grievance to Step II earlier that day. He also stated his reasonable belief that in letting the employee nonetheless discard the materials inappropriately, contrary to policy and statute, others may have violated the law. He then stated that he was not satisfied with the response and would blow the whistle on the matter to other officials. Defendant, on notice of reported violations of law, then engaged in *per se* retaliation in violation of 5 U.S.C. 2302(b)(8)-(9) when it used the Plaintiff's email response to the memo as specific grounds for removal (Charge II, specification 2).

51.    Plaintiff also repeatedly reported, pursuant to the LMA Article 39 (Health & Safety) and 5 U.S.C. 2302(b)(8), the unsafe and unhealthy working conditions of many employees endangered by an adjacent construction site after they started pile-driving iron beams

into the ground. Plaintiff reported that numerous employees experienced headaches, migraines, and ears ringing for hours after they left the office. Yet, Defendant did absolutely nothing to ameliorate the situation in a timely fashion. Instead, in its removal action it discussed Plaintiff's reports as an aggravating reason to remove him from his position because it was taking up too much of the Staff Director's time.

52. Defendant would not have taken this action to remove the Plaintiff absent his protected activities. Defendant's inclusion and consideration of Plaintiff's protected activities, including his whistleblowing, as grounds or justification for removing him, constitutes a *per se* violation of the Plaintiff's rights and is *per se* retaliatory for his engaging in protected activities.

WHEREFORE, Plaintiff respectfully requests the following relief:

a)  Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment for whistleblowing and engaged in prohibited personnel practices in violation of 5 U.S.C. 2302(b);

b)  Award compensatory and pecuniary damages in an amount to be determined by the jury;

c)  Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

d)  Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP

matching, health insurance and all other benefits, and back and front pay with

interest to be determined by the Court and/or jury;

e)      Order the Federal Election Commission to issue retroactive "Outstanding"

Performance Appraisals, annually, for 2003 to present; and

f)      Award reasonable attorney fees, costs and expert witness fees.

## COUNT III
### (Retaliation for Protected Activities – Submitting Suggestions for Improvement of Efficiency of Service through a Labor Management Agreement, pursuant to 5 U.S.C. 2302(b)(8) and (9))

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with

the same force and effect as if set forth herein at length and further states:

53.     Plaintiff was entitled to submit suggestions to improve the efficiency of service at

the FEC pursuant to Article 21 of the LMA.  The LMA provides that each adopted suggestion

which improves the FEC's operations or eliminates waste will result in a financial award, up to

$5,000.  *See also* 5 U.S.C. 4512.  Moreover, because it was not a part of the Plaintiff's job duties

to submit suggestions, the contractual provision provided an important incentive to the federal

workforce at the FEC to eliminate waste of taxpayer dollars.  Such activity is considered a

protected activity.

54.     Plaintiff's previous supervisor encouraged him to be a change agent at the FEC

and stated that he always had very good ideas.  With this support, Plaintiff submitted

approximately 25-30 different suggestions under the award program for cost savings at the FEC.

55.     Several of Plaintiff's suggestions were in fact implemented resulting in tens of

thousands of dollars of savings to the FEC.  In one instance, Plaintiff observed a gross waste of

funds when software was not used throughout the FEC.  Plaintiff recommended that the readily

available software be used by all staff within the division so that they could electronically search

for records instead of having to manually review tens of thousands of pages. A single request to search for such records in one case took a paralegal searching full time approximately 1 week. The software could do the same search in minutes. Such a savings, over a reasonable period, easily would add up to over $50,000 for the FEC, thus resulting in a minimum $5,000 suggestion award. When the Plaintiff made the request, Defendant did not timely respond to it, but later implemented it.

56.     Defendant never awarded the Plaintiff any financial or performance award for implemented suggestions. Plaintiff then included in a grievance that Defendant failed to consider or even evaluate any of his suggestions. This grievance was known by Defendant's Proposing Official and the Deciding Official.

57.     The Proposing Official and an employee relations specialist who was intricately involved in the pre-removal investigation of Plaintiff, both stated that Plaintiff's suggestions were considered part of "docket" Plaintiff had created at the FEC and Defendant considered this docket an aggravating reason to remove Plaintiff from his position.

58.     Accordingly, the FEC retaliated against a motivated employee and engaged in a prohibited personnel practices in violation of 5 U.S.C. 2302(b).

WHEREFORE, Plaintiff respectfully requests the following relief:

a)      Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment and engaged in prohibited personnel practices in violation of 5 U.S.C. 2302(b);

b)      Award compensatory damages in an amount to be determined by the jury;

c)      Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative

leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

d)    Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP matching, health insurance and all other benefits, and back and front pay with interest to be determined by the Court and/or jury;

e)    Order the Federal Election Commission to issue retroactive "Outstanding" Performance Appraisals, annually, for 2003 to present; and

f)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT IV
**(Violation of section 501 of the Rehabilitation Act of 1973, pursuant to 29 U.S.C. 791 – Disability/Handicapping Condition, and 5 U.S.C. 2302(b)(1)(D))**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

59.    Plaintiff timely appealed his removal to the MSPB and EEOC on the ground that the FEC engaged in prohibited personnel practices, including discrimination on the basis of disability and gender. The FEC's arbitrary and capricious decision was not supported by substantial evidence. The MSPB and EEOC issued decisions lacked a reasonable basis to uphold the initial removal action.

60.    Plaintiff is a person with a disability as defined by the Americans with Disabilities Act and the Rehabilitation Act of 1973 as he is substantially limited in the major life activities of sleeping, working, thinking, and concentrating.

20

61.    Plaintiff provided to Defendant two letters from qualified medical providers that verified within the relevant time period Plaintiff was diagnosed with a depressive disorder and that this was interfering with the major life activities of sleeping, working, thinking, and concentrating. The letters also importantly stated that Plaintiff was voluntarily under treatment for his disability.

62.    Plaintiff also provided to Defendant, upon its request, a report from a medical expert who further verified that Plaintiff met the DSM-IV-TR criteria for a depressive disorder, an anxiety disorder, and also a post-traumatic stress disorder. This report was included in Plaintiff's Response to the Notice of Proposal to Remove. This report also stated that his impairments were permanent and were affecting major life activities, including his ability to sleep, think and work. These disabilities and impairments were also further exacerbated by both outside stressors, namely his mother's cancer and the termination of a significant relationship, and the Plaintiff's efforts to seek help through the use of counseling, psychotherapy, and prescription medication.

63.    Defendant was made fully aware of Plaintiff's impairments and the work restrictions as set forth above.

64.    Plaintiff informed his supervisors and Defendant's Office of Human Resources in 2004 that he was stressed and depressed, especially as a result of his mother's cancer and the end of a serious long-term relationship. Plaintiff also informed the third-line supervisor of his depression, stress, migraines, and its impact on his major life activities.

65.    Defendant acknowledged his disabilities when it referred him in May 2004 to the Employee Assistance Program counselor. Plaintiff informed this counselor that he experienced

both depression and anxiety. Defendant was aware that the EAP counselor was not particularly helpful.

66.    Defendant perceived that Plaintiff had these disabilities and was fully informed of them prior to issuance of the Notice of Proposal to Remove. Defendant's Proposing Official reviewed the medical letters Plaintiff submitted and admitted that "it sounded fairly severe."

67.    Plaintiff request reasonable accommodations that would have allowed him to perform the essential duties of his position. Seven months before Defendant removed the Plaintiff, he also filed an EEO complaint which detailed his disabilities and requested accommodations. Every single one of Plaintiff's requests were ignored or denied and the FEC made no effort whatsoever to accommodate or engage in an interactive process with the Plaintiff.

68.    Plaintiff also requested reassignments to other vacant or available positions on several occasions, to different supervisors or divisions in the FEC, or to have different work duties. No fewer than two FEC officials, including Plaintiff's supervisor and a third-line supervisor, summarily denied his requests; a third FEC official, the General Counsel, informed the Plaintiff of vacancies for which he would be qualified in the litigation division of the same office but instructed that he would have to apply and compete directly for them. While the Plaintiff did apply for these positions, he did not receive any consideration for them, and never interviewed for them. Nor did Defendant itself make any effort to relocate the Plaintiff to another position.

69.    Plaintiff qualified, and was able to perform the substantial functions of the above position if he was given reasonable accommodations, despite his disability.

70.    In addition to vacancies in the legal department there were other positions in the FEC that the Plaintiff was qualified for. Defendant's failure to even attempt to reassign the

Plaintiff to a position for which he was qualified, or to even evaluate whether there were any positions available or if the Plaintiff qualified for those positions, violated its obligation under the Rehabilitation Act.

71.    Any reason Defendant had for removing Plaintiff from his position was merely a pretext for discrimination as exhibited by its disparate treatment of other employee without disabilities who engaged in comparably serious alleged conduct.

72.    Plaintiff was subjected to disparate treatment when Defendant departed from its normal disciplinary practices. Defendant has only one servicing personnel office charged with ensuring that the same rules apply to all employees and that there is a consistency of penalties for misconduct throughout the agency, especially to events that may transcend any one office. Indeed, many similarly situated non-disabled employees within the FEC who committed comparably serious (or more egregious) offenses received no or minor discipline compared to Defendant's allegations against the Plaintiff.

73.    In the Office of General Counsel, there were instances where other non-disabled employees engaged in comparably serious conduct, who were not fully cooperative with their supervisors or they were abrasive or their conduct was non-professional or inappropriate. However, there was never any resulting discipline. Defendant ignored its own policy of ensuring a consistency of penalty was applied throughout the Agency, and Plaintiff was treated disparately compared to other employees even within the Office of the General Counsel.

74.    In Defendant's remaining offices, there were also instances of comparably serious allegations by non-disabled employees, including disruptive behavior or inappropriate conduct, that resulted in no or minor discipline. One professional level employee repeatedly failed to follow her supervisor's instructions and was disrespectful towards her supervisor over the course

of one month, but received only a verbal admonishment.  Another GS-12 employee engaged over a four-month period in "rude or disrespectful behavior"  but only received a "counseling memorandum," no discipline.  In another example of disparate treatment, an employee sent an email via the government-owned computers to many people directly calling another employee an "asshole" in the subject line, yet this did not result in any formal counseling or discipline at all.  And in another, much more serious incident that proves Defendant engaged in disparate treatment, a GS-13 employee faced two charges of "insubordination" and "inappropriate conduct."  These charges involved the employee directly refusing to follow a lawful order by his supervisor, and in a separate incident, the employee said in a "loud voice" directly to his supervisor that he "did not have to take this shit," called his supervisor an "asshole" and "stupid," and said that he "did not have to listen" to his supervisor.  Despite the seriousness of the charges, Defendant held the  proposed 30-day suspension in abeyance for one year.

75.      Nor did Defendant ever offer Plaintiff an opportunity to resign – like it did to the former Staff Director or EEO Director – neither of whom faced any discipline after their own serious misconduct which was investigated by the FBI.

76.      Prior to, during and subsequent to the actions taken against the Plaintiff, Mr. Pehrkon, was himself engaged in misconduct of such an egregious nature that he retired after he was escorted out of the FEC building on October 4, 2005.  The misconduct of Mr. Pehrkon, which received public attention through multiple media releases, involved an allegation of sexual harassment by a former female employee who alleged that Mr. Pehrkon made advances toward her and then later attempted to settle the complaint by misappropriating $100,000 in taxpayer funds.  The actions of Mr. Pehrkon brought notoriety to the FEC and involved several other officials.  As a result of Mr. Pehrkon's actions, the FBI became involved, issued search warrants

alleging that Mr. Pehrkon made false statements which it filed in U.S. District Court on November 28, 2005, and seized the computers and searched his office. Rather than taking any disciplinary action against Mr. Pehrkon, Defendant permitted him to retire, thereby retaining all of the benefits and privileges without any loss of pay or reduction in grade. In fact, Defendant released a press release on December 15, 2005 announcing Mr. Pehrkon's retirement and praised his contributions to the FEC. There was no reference to his notable misconduct.

77.    Of course, Mr. Pehrkon was heavily involved in the proposal and decision phases of the action against the Plaintiff. In fact, it was Mr. Pehrkon who made the decision and issued the memorandum directing the Plaintiff to be escorted from the FEC building because of the alleged disruptive behavior and unsupported safety concerns.

78.    Defendant patently subjected Plaintiff, contrary to its normal practices and other comparably serious offenses that occurred at the agency, to disparate treatment based on his disabilities, perceived disabilities, and requested accommodations in violation of section 501 of the Rehabilitation Act of 1973 and 5 U.S.C. 2302(b)(1)(D).

WHEREFORE, Plaintiff respectfully requests the following relief:

a)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment in violation of section 501 of the Rehabilitation Act of 1973;

b)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment and engaged in prohibited personnel practices in violation of 5 U.S.C. 2302(b)(1)(D);

c)    Award compensatory and pecuniary damages in an amount to be determined by the jury;

d) Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

e) Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP matching, health insurance and all other benefits, and back and front pay with interest to be determined by the Court and/or jury;

f) Order the Federal Election Commission to award reasonable accommodations;

g) Order the Federal Election Commission to issue retroactive "Outstanding" Performance Appraisals, annually, for 2003 to present; and

h) Award reasonable attorney fees, costs and expert witness fees.

### COUNT V
**(Violation of Title VII and the Civil Rights Act of 1964;
section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. § 206(d)); and
5 U.S.C. 2302(b)(1)(A) & (C))**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

79. Defendant treated Plaintiff less favorably than others simply because of his gender and subjected Plaintiff to disparate treatment based on the treatment of comparable female employees.

80. Plaintiff is a male and member of that protected class. He was similarly situated to other females in his division, in the office, and in the FEC, who engaged in similarly serious

conduct. In stark contrast to Plaintiff, when female employees have engaged in similarly serious conduct they received more favorable treatment of either no discipline or counseling whatsoever, or in one case, only a written reprimand.

81.    One female employee, who was the same professional grade as Plaintiff, was also known throughout the FEC that she herself had a history of misconduct and frequent instances of disruptive behavior in the workplace that were substantially similar to the conduct alleged against Plaintiff. Plaintiff is informed that she frequently engaged in questionable conduct to include insubordination, slamming doors, accessing computers and files without permission, and shouting matches with her former supervisor. Said employee would be subject to the same disciplinary standards as Plaintiff according to FEC procedures. In fact, while said female employee was substantially controlling all pre-removal investigating of Plaintiff, she engaged in misconduct more serious than Plaintiff's alleged misconduct that warranted strong disciplinary action. As described herein, Plaintiff is informed that said employee intentionally corrupted and biased the entire investigation which later came to substantiate the removal action – in the way the investigation was conducted, and in one instance, she knowingly interfered with contracts between the FEC and neutral third parties. In fact, Plaintiff is informed that her conduct was done in bad faith and with malicious intent as evidenced by the fact that she was confronted by her supervisor and others and lied about her misconduct, but later admitted to it. This same employee also hid an exculpatory opinion from a neutral non-legal consultant from the proposing and deciding officials in this matter. Yet, she faced no discipline. The only reason Defendant did not discipline her for the substantially similar and egregious misconduct is because she was a female who was known for filing her own complaints and grievances against men. Unlike

Plaintiff's conduct, her conduct and disruptive behavior within the office eventually resulted in Defendant reassigning her because of her inability to work with her supervisors and co-workers.

82.    Other comparable female employees of the FEC who engaged in substantially similar and serious conduct were given no formal discipline at all.  Other comparable female employees of the FEC also made remarks similar to those allegedly inappropriate by Plaintiff in emails to co-workers or supervisors, or in meetings, yet faced no discipline at all.  Plaintiff is informed that in one case, a female attorney who worked in the same office as the Plaintiff also engaged in substantially similar conduct, including barking orders as colleagues, being rude, and caustic yet never faced any discipline.

83.    Defendant's use of disparate standards in removing Plaintiff for actions that were comparably serious to conduct that other female employees that did not result in removal were discriminatory in violation of Title VII and the Civil Rights Act of 1964, section 6(d) of the Fair Labor Standards Act of 1938 and 5 U.S.C. 2302(b)(1)(A) & (C).

WHEREFORE, Plaintiff respectfully requests the following relief:

a)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment in violation of Title VII and the Civil Rights Act of 1964;

b)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment in violation of section 6(d) of the Fair Labor Standards Act of 1938;

c)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment and engaged in prohibited personnel practices in violation of 5 U.S.C. 2302(b)(1);

d)    Award compensatory and pecuniary damages in an amount to be determined by the jury;

e)    Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

f)    Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP matching, health insurance and all other benefits, and back and front pay with interest to be determined by the Court and/or jury;

g)    Order the Federal Election Commission to issue retroactive "Outstanding" Performance Appraisals, annually, for 2003 to present; and

h)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT VI
**(Retaliation for Protected EEO Activities, pursuant to 29 C.F.R. 1640)**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

84.    After receiving the Notice of Proposal to Remove, Plaintiff filed an EEO Complaint against it. After the requisite informal pre-EEO Complaint Counseling, a Formal Complaint was filed on February 19, 2005. Defendant's EEO office ruled that the complaint was untimely as the Agency action involved a proposal, and a final Agency action on removal had not been effected.

85.    Before a final decision was made the FEC was clearly on notice by this complaint that the Plaintiff was requesting several accommodations for his previously discussed recognized

disability, based in large part on the EEOC publication, "*Reasonable Accommodations for Attorneys with Disabilities.*"  Some of the accommodations requested included allowing more time off for counseling, allowing telephone calls during work hours to doctors and others for needed support, providing more flexible scheduling, job restructuring, and job reassignment.

86.   The Deciding Official was aware of this EEO complaint.  Thus, the filing of the EEO Claim required the FEC to engage in a process with the Plaintiff to determine what accommodations would be appropriate.  It did not.  Instead, it retaliated against the Plaintiff for filing the EEO Complaint because it was evidence of Plaintiff's disability and requested accommodations that Defendant sought to ignore.

WHEREFORE, Plaintiff respectfully requests the following relief:

a)   Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment for engaging in protected EEO activities;

b)   Award compensatory and pecuniary damages in an amount to be determined by the jury;

c)   Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

d)   Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP

matching, health insurance and all other benefits, and back and front pay with
interest to be determined by the Court and/or jury;

e)    Order the Federal Election Commission to provide reasonable accommodations;

f)    Order the Federal Election Commission to issue retroactive "Outstanding"
Performance Appraisals, annually, for 2003 to present; and

g)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT VII
### (Discrimination on the basis of conduct that does not adversely affect the performance of the employee or the performance of others, pursuant to 5 U.S.C. § 2302(b)(10))

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint
with the same force and effect as if set forth herein at length and further states:

87.    Defendant allegations in Charge I, specifications 1 & 2, concerned Plaintiff's non-
work related/personal activities while visiting the Health Unit and while passing through the
lobby when Plaintiff was "off-duty" and after business hours.  Both allegations involved persons
completely unrelated to Plaintiff's and other employee's positions, duties or performance.
During the alleged incidents and following the alleged incidents, Plaintiff and other employee's
performance was never adversely affected or impacted as a result of any of Plaintiff's personal
conduct.  Neither specification, even if true, adversely affected the performance of the Plaintiff
or any other employee's performance at the agency.

88.    Defendant's allegations in Charge II, specification 7, concerned only a private
joke between Plaintiff and a friend, not overheard by any other person, and took place while the
Plaintiff was on his lunch break.  This specification, even if true, did not adversely affect the
performance of the Plaintiff, as just a few hours later he was placed on non-duty administrative
leave, nor any other employee's performance at the FEC.

31

89.     Any employee's performance that was in fact affected by the Plaintiff's alleged conduct was in fact part of said person's job responsibilities.

90.     Defendant never diminished the Plaintiff's workload as a result of any alleged specification in either Charge I or II, and Plaintiff also continued to represent the FEC, internally and externally, completing all aspects of his job duties.

91.     Accordingly, Defendant's discriminated against the Plaintiff by placing him on administrative leave and then removing him on the basis of alleged conduct that did not adversely affect his performance or the performance of others in violation of 5 U.S.C. 2302(b)(10).

WHEREFORE, Plaintiff respectfully requests the following relief:

a)      Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment and engaged in prohibited personnel practices in violation of 5 U.S.C. 2302(b);

b)      Award compensatory damages in an amount to be determined by the jury; and

c)      Award reasonable attorney fees, costs and expert witness fees.

d)      Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

e)      Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP

matching, health insurance and all other benefits, and back and front pay with

interest to be determined by the Court and/or jury;

f)     Order the Federal Election Commission to issue retroactive "Outstanding"

Performance Appraisals, annually, for 2003 to present; and

g)     Award reasonable attorney fees, costs and expert witness fees.

**COUNT VIII**

**(Violations of Removal Rights; Breach of Contract / Labor Management Agreement)**

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with

the same force and effect as if set forth herein at length and further states:

92.     The LMA provides that, "The Employer _will_ adhere to the general principle of

progressive action, to correct rather than to punish an employee."

93.     Plaintiff had never previously been subjected to any official personnel action,

discipline, or adverse action.  Defendant grossly harmed the Plaintiff when it then violated the

LMA, punishing him by placing him on administrative leave for ten months and then removing

the Plaintiff without engaging in progressive discipline despite his clean record.

94.     The LMA states that along with any Notice of Proposed Adverse Action, the FEC

must provide to the employee the entire "adverse action case file containing any material relied

upon by the Employer" including all "relevant exculpatory information developed as part of any

investigative reports contained in the file." _See also_ 5 U.S.C. 7513(b).  Defendant failed to

provide the entire case file containing all material relied upon prior to making its final decision.

95.     Defendant also knowingly harmed the Plaintiff by violating at least three other

provisions of the LMA.  It failed to propose the adverse action in a timely manner in violation of

Article 48 (1)(E), failed to recommend action within 10 days of placing him on administrative

leave in violation of Article 48 (4)-(5) (instead taking 48 days), and failed to decide on an action

within 30 days of after the expiration of the notice period in violation of Article 48 (4)(C) (taking

171 days). While Plaintiff's entire career hung in the balance, supervisory personnel ignored the

express terms of the contract and took summer vacations.

96.    The unreasonable delay in reaching a decision in this case also hurt Plaintiff's

ability to respond to the charges and gather evidence. During the intervening months several key

witnesses "resigned" or left the FEC. Plaintiff would have called the Staff Director who initially

placed the Plaintiff on administrative leave to testify at the arbitration hearing as a key witness to

the retaliation. However, just a few months earlier the Staff Director resigned under a cloud that

rained on his credibility, after being accused himself of making criminally false statements and

abusing his authority, the FEC placed him on administrative leave. Shortly thereafter the FBI

raided his former office and seized records and he resigned. Thus, the delay was prejudicial and

gravely affected the Plaintiff's ability to present an adequate defense.

97.    Every day that Defendant delayed beyond the terms of the LMA shortened and

interfered with Plaintiff's professional development and career. The extended delay harmed

Plaintiff's career development and upward mobility, financial situation, ability to receive

positive recommendations and performance appraisals, receive training and engage in

substantive work to increase his skills, be promoted, and to seek and get employment elsewhere.

Defendant also knowingly caused Plaintiff additional emotional distress by delaying its

decisions.

WHEREFORE, Plaintiff respectfully requests the following relief:

h)    Find that the FEC breached the Labor Management Agreement with Plaintiff;

i)    Award compensatory damages in an amount to be determined by the jury;

j)    Award any other equitable relief; and

k)     Award reasonable attorney fees, costs and expert witness fees.

## COUNT IX
### (Defamation of Character)

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

98.     Defendant maliciously and intentionally published false statements concerning the Plaintiff to third parties, that were not privileged, and which Defendant knew to be untrue, and that caused Plaintiff special harm. These statements were incident to Defendant discharging the Plaintiff. Such statements were defamatory and also caused infringement into Plaintiff's liberty interests in violation of Plaintiff's due process rights. These statements also caused Plaintiff severe emotional distress.

99.     Defendant empowered one employee to conduct all pre-removal investigating of Plaintiff. Defendant also empowered this employee to coordinate the work of several non-privileged hired third parties to purportedly give independent opinions and advice to management on whether discipline or removal were justified. This employee wrote a letter and had several conversations with one third party which indicated that FEC management had already decided Plaintiff should be fired because he was a threat to others and simply needed an opinion to support that decision. The purported justifications included that Plaintiff was a threat to others. These publications were knowingly false as management had not come to any conclusions and there had never been discussion that he was a threat. As a result, the third party issued an opinion that furthered the lie. When the employee received the tainted opinion, she passed it off as "independently reasoned." This opinion was then read and considered by the Proposing Official before he based his recommendation to propose removal based in part on it. At some point, Defendant's employee was confronted by her supervisor and others about her

35

knowingly false statements; however, Defendant's employee initially denied that she wrote the third party about Plaintiff's case, and then changed her story and denied that she told them that management wanted Plaintiff fired. After this lie was discovered, Defendant contacted a high-ranking human resources official in another agency who produced a truly independent opinion that did not recommend removal. This opinion was given to the same Defendant employee and again she withheld giving it to the proposing and deciding officials. Because the actions of the Defendant's employees in initially denying and covering up their conduct, this shows that it was done with actual malice. However, the now tainted opinion which was based on defamatory statements were still used by both the Proposing and Deciding Officials to remove the Plaintiff from his position.

100.    Security guards stationed at the FEC also knowingly published false statements to third parties regarding the Plaintiff's behavior in the lobby on June 30, 2004. These statements were later maliciously concocted, contrary to their contemporaneous log books, and communicated to the FEC, because the guards were under investigation for not providing any assistance to Plaintiff after he was assaulted. In essence, they lied to save their jobs. These security guards also destroyed the video surveillance that would have also proven their statements false. Their false statements became the evidence of Charge I, specification 1 against the Plaintiff. Even though the glaring inconsistency and falsity of their statements was revealed, the FEC still knowingly repeated their statements to other non-privileged third parties as if they were fact and upheld the charge to remove the Plaintiff.

101.    A nurse in the Defendant's Health Unit knowingly published false statements to third parties regarding the Plaintiff's behavior in the health unit on September 7, 2004 and others who allegedly sought treatment after interacting with Plaintiff. Her statements were maliciously

concocted, contrary to her own contemporaneous nursing and patient logs, and communicated to the FEC, because she too knew that Plaintiff had wanted to file a complaint against her for inability to do her job. Her false statements were then used by the Defendant to place the Plaintiff on administrative leave and then as evidence of Charge I, specification 2. Even though the glaring inconsistency and falsity of her statements was revealed, the FEC still knowingly repeated her statements to other non-privileged third parties as if they were fact and upheld the charge to remove the Plaintiff.

102.    The harm from these defamatory publications had a cascading impact, resulting in biased and tainted evidence used against Plaintiff in the removal process. Plaintiff then became injured in his trade, profession, and community as he has not had a permanent job in the legal profession, despite applying for and being qualified for numerous jobs, for over two years. Plaintiff has also suffered added financial damages and mental anguish and emotional distress.

103.    Defendant also continued to inflict harm after publishing statements, knowing they were false, and in retaliation for his previous protected activities, by informing third parties about his removal and the falsified reasons for it when it was contacted for references.

WHEREFORE, Plaintiff respectfully requests the following relief:

l)    Find that the FEC intentionally and maliciously defamed Plaintiff;

m)    Award compensatory and pecuniary damages in an amount to be determined by the jury;

n)    Award other equitable relief; and

o)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT X
### (Violation of Plaintiff's Right to Privacy, pursuant to 5 U.S.C. 552a)

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

104.    Defendant grossly violated the Plaintiff's right to privacy on numerous occasions. Plaintiff provided to Defendant several letters from qualified medical providers that revealed private medical information protected from disclosure. Defendant then provided these letters to non-legal persons outside of the FEC without Plaintiff's knowledge or consent.

105.    Subsequently, Defendant wrongly made Plaintiff's medical history an issue when it challenged him in its Notice of Proposal to Remove to provide additional medical evidence. Plaintiff, complying with the request, received an expert medical report that verified his medical condition was a recognized disability, and that Defendant could provide accommodations for it. Plaintiff also provided Defendant several pages from his personal medical file. Defendant then distributed this report and medical file to non-legal persons outside of the FEC without Plaintiff's knowledge or consent.

106.    Defendant also violated Plaintiff's right to privacy when it revealed to non-legal third persons outside the FEC without Plaintiff's knowledge or consent that Plaintiff was a patient in its Health Unit, why and when he visited it, and other private information.

107.    Defendant's disclosures of Plaintiff's private medical information violated 5 U.S.C. 552a.

WHEREFORE, Plaintiff respectfully requests the following relief:

p)    Find that the FEC violated Plaintiff's right to privacy;

q)    Award compensatory damages in an amount to be determined by the jury; and

r)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT XI
### (Violation of the Family & Medical Leave Act of 1993)

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

108.    Plaintiff spoke at length with Defendant's Office of Human Resources and an employee relations specialist about his mother in 2004 and indicated that he wanted to take time off from work for an extended period to care for her during treatment.

109.    Defendant informed Plaintiff that he could not take off more time than he had accrued for sick and annual leave.  As a result, the first time that Plaintiff was able to visit her after learning of the diagnosis was in late May over Memorial Day weekend.

110.    Defendant's denial of Plaintiff's lawful request to be with his mother during this time blatantly violated section 201 of the Family & Medical Leave Act and left the Plaintiff emotionally distraught, depressed, and more anxious for months.  By the time that Plaintiff returned from his visit home, he was still distraught and depressed over this limited role he could play in her care.

WHEREFORE, Plaintiff respectfully requests the following relief:

a)    Find that the FEC violated Plaintiff's rights under the Family & Medical Leave Act;

b)    Award compensatory damages in an amount to be determined by the jury;

c)    Award pecuniary and non-pecuniary damages;

d)    Award other equitable relief; and

e)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT XII
### (Violation of Plaintiff's Constitutional Right to Due Process – Fifth & Fourteenth Amendments)

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint with the same force and effect as if set forth herein at length and further states:

111.    Plaintiff was entitled to due process prior to his removal and deprivation of liberty interests pursuant to the U.S. Constitution, 5 U.S.C. 7513, and the LMA.

112.    Throughout the removal process Defendant relied on evidence used against Plaintiff but either withheld or refused to disclose that evidence. This evidence included accusatory statements by unknown persons who visited the Health Unit at the FEC; medical reports which provided assessments, diagnoses, conclusions and recommendations; exculpatory evidence; and so-called "aggravating factors."

113.    When Defendant initially placed Plaintiff on administrative leave it justified this action by stating that certain unidentified employees had sought assistance from the Health Unit after interacting with the Plaintiff and becoming upset. When Defendant issued the Notice of Proposal to Remove it again relied on these unnamed accusers in justifying the proposal. The Deciding Official also relied on these statements, considered them material, and stated that removal was necessary because of them. During arbitration, and over objection, Defendant again stated that it relied on the complaining employees in coming to its decision to remove the Plaintiff. The Arbitrator considered the allegation and upheld the removal in part because of it. Multiple requests by Plaintiff and the NTEU to learn the identity of the unnamed employees were denied at each stage and Plaintiff never knew the identity of his alleged accusers, nor was he given an opportunity to question or examine those people.

114.   The Deciding Official also received two *ex parte* communications from purported medical witnesses which he considered material, and specifically relied upon them in coming to his decision to remove Plaintiff and justifying his decision.   Prior to removal the Deciding Official never provided Plaintiff with the medical correspondence and report used against him, never identified them as witnesses or that the medical correspondence and report existed as part of the materials relied upon, and never afforded Plaintiff an opportunity to respond to it prior to his removal.

115.   Defendant also withheld exculpatory evidence it was required to provide to Plaintiff.   As part of its pre-removal investigation, Defendant uncovered a number of exculpatory facts that it refused to disclose or provide to Plaintiff.   Among these were the fact that there was video surveillance of the purported activities when the Plaintiff entered into Defendant's lobby but that this tape was destroyed following the attack by the guards.   Such a blatant destruction of exculpatory evidence, and then failing to disclose the existence (or destruction) of that evidence, was material and a *per se* violation of Plaintiff's right to due process.

116.   Defendant also relied on purported non-legal consultant reports as part of the adverse action case file and the materials relied upon in removing the Plaintiff.   Defendant also considered evaluations by Federal human resources personnel with extensive subject matter expertise that removal was unjustified.   Defendant is required to disclose to Plaintiff any evidence it considered against Plaintiff, including exculpatory reports.   The NTEU requested that these internal and external reports be produced but Defendant denied this request and considered them in coming to its decision to remove Plaintiff.

117.   Defendant also produced during arbitration, over objection, a number of alleged aggravating facts which it considered in the process of recommending removal and then issuing a

final decision upholding removal in violation of 5 U.S.C. 7513. However, Defendant never gave notice of these "other reasons" to the Plaintiff as part of the adverse case file or materials relied upon when Defendant issued its Notice of Proposal to Remove. These material facts were then wrongly considered by the Arbitrator and included hearsay evidence from two purported medical personnel; various incidents of otherwise protected activities that Defendant claimed made up a "docket" that was simply taking too much of its time; an alleged Hatch Act concern that did not violate any law, rule or regulation; and an allegation that Plaintiff used his work computer for alleged non-work activities. Such facts mentioned for the first time as reasons the Defendant removed Plaintiff from his position, but which never appeared in the Notice of Proposal to Remove or Final Decision, fundamentally denied the Plaintiff an opportunity to respond to them before the Deciding Official.

WHEREFORE, Plaintiff respectfully requests the following relief:

a)     Find that the FEC violated Plaintiff's right to due process;

b)     Find that the Federal Election Commission wrongfully terminated the Plaintiff's employment;

c)     Award compensatory damages in an amount to be determined by the jury;

d)     Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

e)     Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases,

restorations of leave taken and leave retroactively earned, retroactive TSP

matching, health insurance and all other benefits, and back and front pay with

interest to be determined by the Court and/or jury;

f)    Order the Federal Election Commission to issue retroactive "Outstanding"

Performance Appraisals, annually, for 2003 to present; and

g)    Award reasonable attorney fees, costs and expert witness fees.

## COUNT XIII
### (Violation of law, rule and regulation governing the Merit System, pursuant to 5 U.S.C. 2302(b)(12) and 2301; 5 U.S.C. 7513)

Plaintiff repeats and re-alleges all allegations and facts contained in this Complaint

with the same force and effect as if set forth herein at length and further states:

118.    At the arbitration hearing, over objection, the arbitrator considered evidence that

was not contained in the disclosed materials relied upon, and failed to order the FEC to produce

this and certain other exculpatory evidence of comparably serious offenses. The arbitrator failed

to accord the evidence sufficient weight and conclude that the FEC's decision to remove lacked

substantial evidence. When the arbitrator issued his opinion, it was materially deficient in key

respects, and violated numerous laws, rules and regulations concerning the merit system.

Accordingly, Plaintiff's removal did not promote the efficiency of the service in violation of

5 U.S.C. 7513.

WHEREFORE, Plaintiff respectfully requests the following relief:

g)    Find that the arbitration decision was contrary to law, rule and regulation and

vacate it;

h)    Find that the Federal Election Commission wrongfully terminated the Plaintiff's

employment and engaged in prohibited personnel practices;

i)   Award compensatory damages in an amount to be determined by the jury;

j)   Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

k)   Order the Federal Election Commission to restore Plaintiff to his civil service employee status, and award Plaintiff retroactive promotions, step increases, restorations of leave taken and leave retroactively earned, retroactive TSP matching, health insurance and all other benefits, and back and front pay with interest to be determined by the Court and/or jury;

l)   Order the Federal Election Commission to issue retroactive "Outstanding" Performance Appraisals, annually, for 2003 to present; and

m)   Award reasonable attorney fees, costs and expert witness fees.

### Jury Trial Demand

119.   Plaintiff hereby demands pursuant to Fed. R. Civ. P. 38(b) a trial by jury in the above captioned matter on all issues herein.

### Request for Relief

**WHEREFORE**, Plaintiff respectfully further requests this Court find in favor of the Plaintiff on each and every count, and on each and every count:

120.   Issue a permanent injunction prohibiting the Federal Election Commission, its commissioners, officers, agents, employees and successors, from engaging in the retaliatory, discriminatory, and defamatory practices stated herein;

121.    Order the Federal Election Commission to educate all employees on an annual basis of their rights and the employer's duties pertaining to grievances, whistleblowing, disabilities and reasonable accommodations, discrimination and retaliation;

122.    Order the Federal Election Commission to expunge and destroy all records and references in any documents related to any counseling, warnings, administrative leave, and disciplinary or removal/adverse action against the Plaintiff, including all events contained therein, and to notify any other person or entity previously informed by the Federal Election Commission of the of the corrected record;

123.    Award compensatory damages to Plaintiff appropriate to the proof at the trial;

124.    Award pecuniary and non-pecuniary damages to Plaintiff appropriate to the proof at the trial;

125.    Award reasonable attorney fees and costs, including fees for experts; and

126.    Order such other and further relief as the Court deems just and equitable.

Respectfully submitted, *pro se*,

**Daniel G. Pinegar**
1600 S. Joyce Street, Apt. 1604
Arlington, VA  22202
Tel:  703-920-7666

Dated:  September 4, 2007

H
07-1560
HHK

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DANIEL G. PINEGAR    88888 | FEDERAL ELECTION COMMISSION |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Arlington, VA (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Washington, D.C. (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Daniel G. Pinegar 1600 S. Joyce Street, #1604 Arlington, VA 22202 Tel: 703-920-7666 | Case: 1:07-cv-01560 Assigned To : Kennedy, Henry H. Assign. Date : 9/4/2007 Description: Employ. Discrim. |

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff
O 3 Federal Question (U.S. Government Not a Party)
⊙ 2 U.S. Government Defendant
O 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| O A. Antitrust | O B. Personal Injury/ Malpractice | O C. Administrative Agency Review | O D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act **Social Security:** ☐ 861 HIA ((1395ff)) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

**O E. General Civil (Other)** —— OR —— **O F. Pro Se General Civil**

| | | | |
|---|---|---|---|
| **Real Property** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property **Personal Property** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | **Bankruptcy** ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **Prisoner Petitions** ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition **Property Rights** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark **Federal Tax Suits** ☐ 870 Taxes (US plaintiff or defendant ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** ☐ 610 Agriculture ☐ 620 Other Food &Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other **Other Statutes** ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

(4)

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Violation of Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.; Civil Rights Act of 1991; Prohibited Personnel Actions pursuant to 5 U.S.C. 2302(b); etc.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $** _____    Check YES only if demanded in complaint    **JURY DEMAND:**    YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY** 2.F    (See instruction)    YES ☐   NO ☒    If yes, please complete related case form.

DATE  September 4, 2007    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.